# In the United States Court of Federal Claims

| | |
|---|---|
| CW GOVERNMENT TRAVEL, INC. doing business as CWSATO TRAVEL,<br>Plaintiff,<br>v.<br>THE UNITED STATES,<br>Defendant,<br>and<br>OMEGA WORLD TRAVEL, INC.,<br>Defendant-Intervenor. | No. 26-366<br>Filed under seal: July 28, 2026<br>Reissued: August 18, 2026 |

Lars E. Anderson, Odin, Feldman & Pittleman, Reston, VA, for plaintiff.
Nereida Guadalupe Lopez Favela, Commercial Litigation Branch, United States Department of Justice, Washington, DC, for defendant.
Barry Roberts, Roberts Attorneys PA, Palm Beach Gardens, FL, for intervenor.

**OPINION AND ORDER**

**Granting the government's and intervenor's cross-motions for judgment on the administrative record and denying plaintiff's motion for judgment on the administrative record**

Plaintiff CW Government Travel, Inc. (CWT) protests the General Service Administration's (GSA's) decision to award a contract to Omega World Travel, Inc. for providing travel services to the U.S. Marine Corps.[1] CWT argues that GSA arbitrarily and capriciously evaluated CWT's proposal by applying unstated criteria and violating the terms of the solicitation or regulations. CWT also argues that GSA improperly waived solicitation requirements for Omega. The government responds that CWT's challenges amount to mere disagreement with GSA's decision.

[1] This opinion was originally issued under seal on July 28, 2026. The government filed proposed redactions on August 10, 2026. ECF No. 65. The court reissues this public order accepting the proposed redactions.

CWT moves for judgment on the administrative record and for a permanent injunction. The government and Omega, as intervenor, cross-move for judgment on the administrative record.

Because GSA's determinations were not arbitrary or capricious, the court will grant the government's and Omega's cross-motions for judgment on the administrative record and will deny CWT's motion for judgment on the administrative record.

## I. Background

On behalf of the U.S. Marine Corps and Department of Defense, GSA issued a solicitation seeking proposals for a contract to provide travel agent services in the contiguous United States, Hawaii, and Japan. *See* AR743; AR1594-97.[2] The task order would be awarded based on a best-value analysis under Federal Acquisition Regulation (FAR) 8.405-2(d). AR1690. Proposals would be evaluated based on five factors: passenger name record validation, technical approach, past performance, small business participation, and price. *Id*. The solicitation explained that passenger name record validation and small business participation would be evaluated as acceptable or unacceptable. *Id*. Technical approach and past performance would be weighed equally, and the combined non-price factors were significantly more important than price. *Id*. The price could become more important if proposals received similar non-price ratings. *Id*. GSA would evaluate the prices to ensure that they were fair and reasonable, but it would not conduct a realism analysis. AR1693. The solicitation was amended four times. *See* AR1177; AR1186; AR1529; AR1530; *see also* AR3851.

GSA received two timely and eligible proposals: one from CWT, the incumbent contractor, and the other from Omega. AR3851-52. GSA received a third proposal from American Express,

[2] The parties submitted an administrative record to the court and also filed a joint appendix through ECF. ECF No. 43 (and attachments). The court will cite the administrative record with the designation AR.

which GSA rejected as ineligible. *Id.* GSA's technical evaluation team and then-contracting officer initially evaluated the proposals for non-price factors. *See* AR3367-93.

The contracting officer then conducted exchanges with CWT concerning its technical approach and past performance. *See* AR3063-292; AR3293-303; *see also* AR3877. He also conducted exchanges with Omega concerning its past performance. *See* AR3304-08. The technical evaluation team determined that the exchanges with CWT did not address the weaknesses in its technical proposal, so the team did not alter CWT's technical rating. AR3385. The technical evaluation team's ratings (AR3856) are summarized below.

| Vendor | Factor A - PNR Validation | Factor B - Technical Approach | Factor C - Past Performance | Factor D - Small Business Participation |
|---|---|---|---|---|
| Omega | Pass | Good | Relevant<br>Substantial confidence with low risk<br>(see narrative in step 2 on page 16) | Acceptable |
| CWT | Pass | Acceptable[1] | Very Relevant<br>Limited confidence with high risk<br>(see narrative in step 2 on page 26) | Acceptable |

AR3857 (PNR stands for Passenger Name Record (AR1535-36)).

A price evaluation team and the contracting officer evaluated both offerors' proposed prices. *See* AR3770-94; AR3855-56. The contracting officer conducted an exchange with Omega seeking information on Omega's pricing. AR3309-23. Omega's price list referred to Omega's Multiple Award Schedule pricing. AR2316-23; *see* FAR 8.402(a). The Multiple Award Schedule is a program managed by GSA designed to simplify the procurement process for federal agencies. FAR 8.402(a). Schedule contractors, like Omega, are required to provide a list of supplies and services the contractor offers and the pricing, terms, and conditions associated with each item. FAR 8.402(b). Omega responded with a narrative tying its proposed pricing to its Multiple Award Schedule pricing. AR3309-15.

The solicitation's fourth amendment included a notification that there would be a new contracting officer. AR1530. The new contracting officer reevaluated the proposals based on the solicitation's four non-price factors. She determined that one of CWT's weaknesses should be removed and that CWT's technical approach rating should be increased from "acceptable" to "good." AR3869-71; *see* AR3896 (signed by Erin Lush). The final non-price ratings for CWT and Omega are summarized in the table below.

| Offeror | Factor A PNR Validation | Factor B Technical Approach | Factor C Past Performance | Factor D Small Business Participation |
|---|---|---|---|---|
| Omega | Pass | Good | Relevant / Substantial confidence with low risk | Acceptable |
| CWT | Pass | Good | Very Relevant / Limited confidence with high risk | Acceptable |

AR3894 (award decision).

The new contracting officer completed the award decision, including the technical and price evaluations, on July 16, 2025. AR3848-99. GSA awarded the contract to Omega and notified CWT of the award. AR3900-04; AR3950-53. CWT filed a protest with the Government Accountability Office on July 31, 2025. AR4164. The Government Accountability Office determined that GSA had "thoroughly reviewed [CWT's] performance record and reached a reasoned judgment" and that "GSA's evaluation was factually supported, reasonable, and consistent with the terms of the solicitation." AR5473. The Government Accountability Office also determined that CWT's "challenges to [GSA's] technical evaluation show[ed] only its disagreement with the agency's evaluation judgments" (AR5476-78) and that there was "nothing improper in the pricing proposed by Omega or the firm's supporting narrative" (AR5481). The Government Accountability Office

further noted that GSA's award decision "was based on a reasonable evaluation of both quotations that was consistent with the [solicitation's] best-value criteria." AR5483-84.

On March 5, 2026, two days before its incumbent contract expired (*see* AR6121), CWT filed its protest in this court (ECF No. 1).

**II. Discussion**

This court's jurisdiction is primarily defined by the Tucker Act, which provides the court with "jurisdiction to render judgment … in connection with a procurement or proposed procurement." 28 U.S.C. § 1491(b).

Cross-motions for judgment on the administrative record are governed by rule 52.1(c) of the Rules of the Court of Federal Claims (RCFC). "RCFC [52.1] requires [this court] ... to make factual findings from the record evidence as if it were conducting a trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1353-54 (Fed. Cir. 2005). The court then considers "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence of record." *Harmonia Holdings Group, LLC v. United States*, 20 F.4th 759, 766 (Fed. Cir. 2021) (quotation marks omitted).

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, requires this court to review an agency procurement decision under the standards provided by the Administrative Procedure Act (APA). 28 U.S.C. § 1491(b)(1)-(4). Under the APA, "an agency's decision is to be set aside only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *NVT Technologies, Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (quoting 5 U.S.C. § 706). In the bid protest context, according to the Federal Circuit, an "award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Banknote Corp. of America v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (quotation marks omitted).

To determine whether the decision lacked a rational basis, the court determines "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Mitchco International, Inc. v. United States*, 26 F.4th 1373, 1384 (Fed. Cir. 2022) (quotation marks omitted). "Contracting officers are given broad discretion in their evaluation of bids," and a court may not substitute its judgment for the agency's reasonable decision. *DynCorp International, LLC v. United States*, 10 F.4th 1300, 1311 (Fed. Cir. 2021) (quotation marks omitted). A protester "bears a heavy burden" to demonstrate that the agency's decision lacked a rational basis. *AgustaWestland North America, Inc. v. United States*, 880 F.3d 1326, 1332 (Fed. Cir. 2018) (quotation marks omitted).

The court gives even greater deference to an agency's best-value determination. "It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value." *Banknote*, 365 F.3d at 1355. And the Federal Circuit has "recognized that evaluation of past performance is a matter within the discretion of the contracting agency and that the agency's reasonable interpretation of the facts is entitled to considerable deference." *Taahut v. United States*, 849 F. App'x 260, 266 (Fed. Cir. 2021) (marks omitted).

Even if the court finds that the agency acted arbitrarily, capriciously, or contrary to law, a protester is entitled to relief only if it "was prejudiced by that conduct." *Bannum*, 404 F.3d at 1351.

### A. GSA rationally evaluated the offerors' staffing proposals

CWT argues that GSA unreasonably evaluated the offerors' staffing proposals by (1) relying on the wrong number of agents when evaluating CWT's proposed staffing (ECF No. 33-1 at 2-9) and (2) not downgrading Omega's rating for failure to identify dedicated after-hours agents (*id.* at 10-15).

### 1. GSA reasonably considered CWT's proposed staffing numbers in its analysis

The contracting officer compared CWT's and Omega's staffing proposals. The contracting officer noted, "The [Travel Management Company] Assist [line item] has the bulk of the service quantities at an estimated 146,600 transactions each period." AR3895. For that line item, CWT offered a lower price, but "CWT's price comes with a ratio of 1 agent per [redacted] transactions, or approximately [redacted] agents. Omega's price comes with a ratio of 1 agent per [redacted] transactions or approximately [redacted] agents. … CWT has proposed using fewer agents than [redacted], the total number of agents currently being used by CWT under the [incumbent] task order." *Id.*

The contracting officer addressed each offeror's Service Level Agreements (SLAs), which define performance standards for services provided under a particular government contract (*see* AR1678). Thus, the contracting officer used CWT's SLAs as a way to compare CWT's own earlier performance against the expectations for that contract. According to the contracting officer, "[i]t is important to note that even with [redacted] agents, CWT was not meeting their SLAs for 2023. There are consistent deficiencies from 2023 through 2025 on the risk of meeting SLAs. Having fewer agents than the current [incumbent] task order is a risk, and coupled with that and CWT's limited confidence / high risk in past performance, it is worth it to the Government to trade-off for Omega's past performance history." AR3895.

CWT argues that GSA based its evaluation on a number of proposed agents that did not match what CWT was proposing. ECF No. 33-1 at 3. According to CWT, it proposed "[redacted]" *Id.* CWT argues that because GSA relied on the [redacted]-agent number, rather than the [redacted]-agent

number, in making its best-value determination, GSA's ultimate decision to award the contract to Omega was arbitrary and capricious. *Id.* at 9-10.

But, as the government notes (ECF No. 35 at 16), GSA used the [redacted]-agent number in reference only to Travel Management Company Assist transactions; the [redacted]-agent number is not meant to encompass the entire contract, which includes another 45 line items and another fourteen types of transactions. *See* AR3895; AR3849-50. In other words, the contracting officer could agree that CWT was proposing to provide a total of [redacted] full-time agents and also have concerns that CWT would not provide enough agents specifically for Travel Management Company Assist transactions. In fact, CWT concedes that, for Omega's proposal, the number of agents attributed to Omega for Travel Management Company Assist transactions ([redacted] agents) also does not encompass all of the agents described in Omega's staffing approach ([redacted] agents). ECF No. 33-1 at 37-38. Thus, CWT acknowledges that the agent numbers described in an excerpt of the award decision are not meant to represent staffing proposed for the entire contract for either party.

In response, CWT points out that the contracting officer compared the [redacted] agents for Travel Management Company Assist to the [redacted] agents CWT used for the entire incumbent contract, suggesting that GSA evaluated the entire contract as though CWT had proposed providing only [redacted] agents. ECF No. 37 at 3. But that one misstatement, comparing the number of agents for one line item to the number of agents used for the entire incumbent contract, does not undermine the overall rationality of GSA's analysis. *See Thalle Construction Co. v. United States*, 169 Fed. Cl. 592, 642-43 (2024) (agency's citation to incorrect page of offeror's proposal did not undermine agency's ultimate analysis). In context, it is clear that the contracting officer was comparing the number of agents proposed by CWT for the line item ([redacted]) to the number of agents proposed by Omega for

the same line item [redacted]. And the contracting officer was separately pointing out that CWT had struggled to meet its goals as the incumbent.

GSA's tradeoff analysis compares the value offered by CWT to the value offered by Omega. CWT does not dispute that GSA used the same methodology to estimate that Omega was offering [redacted] agents under the Travel Management Company Assist line item that it used to estimate that CWT was offering [redacted] agents under the same line item. *See* ECF No. 37 at 3-7. GSA used 1 agent per [redacted] transactions for estimating CWT's staffing because CWT explained that it was generally using that ratio for staffing (although it would round up or down to avoid partial agents).[3] *See id.* at 6. Similarly, GSA used the ratio of 1 agent per [redacted] transactions for Omega because Omega proposed using that staffing ratio for transactions across the board. AR2624; AR3883; *see also* AR2620 ("Where data is not available, Omega will staff with 1 agent per [redacted] transactions.").

To the extent that CWT argues that GSA provided no reasonable explanation for its [redacted]-agent number (ECF No. 33-1 at 3-4), GSA explained in the award decision how it arrived at that number: GSA applied the [redacted] ratio that CWT provided to the estimated Travel Management Company Assist transactions. AR3895. In other words, GSA reasoned that 146,600 transactions

---

[3] CWT proposed a ratio of 1 agent per [redacted] transactions in the United States and 1 agent per [redacted] transactions in Japan. AR2199; *see* AR3869. CWT notes in a footnote in its reply brief that GSA failed to consider CWT's proposed ratio for transactions in Japan when evaluating its technical approach. ECF No. 37 at 4 n.3. Based on CWT's historical transaction data, about [redacted] percent of all agent-touched transactions occurred in Japan. *See* AR2213-17 ([redacted] transactions in Japan out of a total 160,136 transactions). Applying that number and the proposed agent-to-transaction ratio for Japan to GSA's analysis would yield approximately [redacted] proposed agents for Travel Management Company Assist transactions. That is still less than the number of agents proposed by Omega [redacted] and the number of agents CWT staffed on the incumbent contract [redacted]. Thus, any failure by GSA to consider the agent-to-transaction ratio for Japan, to the extent that CWT even makes the argument, was harmless. *See Bannum*, 404 F.3d at 1351 (A protester is entitled to relief only if it "was prejudiced by that conduct."); *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) ("[A]rguments raised in footnotes are not preserved.").

divided by [redacted] transactions per agent equals [redacted] agents, which rounds up to [redacted] agents. GSA reasonably explained its calculation and reasonably compared that to Omega's [redacted] agents for the same line item when making its best-value determination. This court will not second guess GSA's methodology for comparing CWT's proposal to Omega's as it related to Travel Management Company Assist transactions, because that analysis falls within the agency's technical discretion. *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996) ("[S]uch matters as technical ratings … involve discretionary determinations of procurement officials that a court will not second guess."). The resulting best-value determination was neither arbitrary nor capricious and, like the technical evaluation it was based on, falls within the agency's "great deal of discretion." *Banknote*, 365 F.3d at 1355.

Even if GSA had mischaracterized CWT's proposed staffing in that portion of the award decision, the staffing on Travel Management Company Assist transactions represents just one piece of GSA's tradeoff analysis. *See* AR3894-96. In that analysis, GSA also described CWT's prior failure to meet service level standards and described the resources the government had to expend to monitor CWT because of that failure. AR3895-96 ("CWT is the only GSA managed [defense travel management office travel management company] that has oversight because of not meeting [service level agreements]."). GSA acted within its discretion by considering CWT's past performance issues and determining that, based on CWT's prior failures to meet standards, Omega offered the better value. *See Banknote*, 365 F.3d at 1355.

**2. GSA reasonably determined that Omega did not need to specifically identify a number of after-hours agents**

CWT also challenges GSA's evaluation of Omega's staffing proposal. CWT argues that GSA effectively waived the requirements of the solicitation for Omega when it rated Omega's workforce plan "Good" despite Omega's proposing "zero dedicated staff devoted full time to the

contract for afterhours travel service" and not identifying the number of agents for each location. ECF No. 33-1 at 10; *see id.* at 15.

The solicitation explains that the chosen contractor will provide "customer service 24 hours a day, seven (7) days a week and 365 days a year." AR1567 (§ 1.8.1). The solicitation later requires that the contractor "[p]rovide staffing at on-site offices in Government owned facilities and the number of agents designated to providing travel services at on-site locations listed … . For all other sites / locations under the [solicitation, the contractor must] provide a Personnel Workforce staffing plan approach to include the place of performance and number of agents designated to providing services." AR1594 (§ 1.15.1) (emphasis omitted). The solicitation does not state that offerors must propose a number of after-hours agents in particular.

CWT argues that the solicitation nevertheless implicitly requires that offerors propose a number of after-hours agents. First, CWT infers that after-hours agents must work at non-government facilities because government facilities are closed after hours. ECF No. 33-1 at 12-13; ECF No. 37 at 9. By that logic, the after-hours agents would necessarily be working at "other sites / locations" and would therefore need a particular number. *See* ECF No. 33-1 at 11-12; ECF No. 37 at 7 n.6.

As the government points out (ECF No. 35 at 19), though, the solicitation does not mention a number of after-hours agents. *See, e.g.*, AR1594-95. It requires round-the-clock service, which Omega proposed to supply. *See, e.g.*, AR2326-27; AR2532 ("Omega will provide … customer service 24 hours a day, 7 days a week, and 365 days a year to the [U.S. Marine Corps]."). The agency must evaluate proposals "solely on the factors specified in the solicitation." 41 U.S.C. § 3701(a); *see also* 48 C.F.R. § 15.305(a). GSA reasonably determined that the solicitation did not specify that each offeror was required to identify the number of agents it would use to staff its call

centers after hours. Because the solicitation did not require Omega to identify the number of proposed after-hours agents, GSA did not waive solicitation requirements when it rated Omega's technical proposal as "Good." GSA's evaluation of Omega's staffing proposal was not arbitrary, capricious, or an abuse of discretion.

### B. GSA rationally evaluated the offerors' past performance

CWT also argues that GSA improperly evaluated the offerors' past performance—both CWT's own and Omega's. CWT takes issue with (1) the importance GSA placed on CWT's phone response times under earlier contracts (ECF No. 33-1 at 15-17) and (2) the ratings GSA assigned to Omega's past performance (*id.* at 20-30). The agency has broad discretion in evaluating past performance, both its quality and its relevance to the upcoming contract. *Glenn Defense Marine (ASIA), PTE LTD. v. United States*, 720 F.3d 901, 911 (Fed. Cir. 2013).

#### 1. GSA rationally weighted CWT's earlier phone response times

CWT argues that GSA treated phone response time as the most important consideration and that the solicitation did not convey its importance; CWT thus argues that GSA applied an undisclosed criterion, to CWT's detriment. ECF No. 33-1 at 16-17; *id.* at 15 (citing *Isratex, Inc. v. United States*, 25 Cl. Ct. 223, 230 (1992)). CWT also argues that, because its past performance reviews included a quality element that encompassed phone response times, GSA "effectively double-counted" the phone response times. ECF No. 33-1 at 17-19.

But the solicitation repeatedly refers to phone service requirements, including phone response time. *See, e.g.*, AR1771 (standards include "[p]rovid[ing] callers with expected wait times within 90 seconds" and "[m]aintain[ing] a monthly service level of 70% of total calls … that are assisted by agent(s) within 30 seconds during business hours"); *id.* (same for after-hours calls); *id.* ("[t]he remaining 30% of call hold times should not exceed 60 seconds"); AR1567-68 (describing phone response time requirements). Section 1.8.4 describes "general requirements," including

maximum phone response time. AR1567-68. That section also details the metrics a contractor must meet when responding to requests via phone and email. *Id.* (§ 1.8.4(a)-(i)). Phone response time is also discussed in different parts of the solicitation. It is in the general requirements of the solicitation (AR1567-68) and performance standards (AR1604). The solicitation further defines "service level" as "percentage of calls answered within a specified time frame" and describes that metric as a measurement of the "quality and efficiency of a call center's customer service." AR1542 (§ 1.4.2). There is no dispute that phone response time is an element of the solicitation.

GSA further noted the importance of phone response time in exchanges with CWT. *See* AR3063-65 (noting CWT's prior failure to meet phone response times and giving CWT an opportunity to provide a revised quote). Those repeated references to phone response times indicate that GSA cared a lot about phone response times. *See, e.g.*, *United States v. Clintwood Elkhorn Mining Co.*, 553 U.S. 1, 7 (2008) ("Five 'any's' in one sentence and it begins to seem that Congress meant the statute to have expansive reach.").

A contracting officer "may give unequal weight, or no weight at all, to different contracts when [the contracting officer] views one as more relevant than another." *American Auto Logistics, LP v. United States*, 117 Fed. Cl. 137, 186 (2014) (citation omitted), *aff'd* 599 F. App'x 958 (Fed. Cir. 2015).

CWT argues that *American Auto* only "shows that a past performance factor can specify particular work requirements to receive focus." ECF No. 37 at 15 n.15. CWT distinguishes that from the solicitation at issue here, which explicitly lists phone response time as a considered factor but, according to CWT, does not specify that phone response time is entitled to any particular focus. *See id.* But here, the solicitation made clear that GSA would consider past phone response

times. *See, e.g.*, AR1859-60 (listing "success in providing travel management services" and "results achieved including consistently meeting or exceeding service levels" as areas of evaluation for past performance ratings). That is sufficient for GSA to assign particular relevance to CWT's past phone response times.

CWT cites *Isratex*, 25 Ct. Cl. at 230, for the proposition that "where one factor is to have predominant consideration over the other factors, this should be disclosed to the offerors." But *Isratex* concerned an agency's treating one factor as a "mandatory requirement" without disclosing that to offerors. *Id.* There, failure to meet that requirement "automatically disqualif[ied]" an offeror's proposal. *Id.* Here, by contrast, GSA did not treat meeting past phone response time requirements as mandatory; nothing about past phone response times would automatically disqualify CWT's proposal. CWT and Omega submitted similar proposals; in any close call, one factor may be decisive because the proposals are otherwise similar. GSA reasonably determined that past phone response times were an important factor. *See, e.g.*, AR3894-95 (comparing CWT and Omega on factors of proposed staffing, the need for supervision in prior contracts, and satisfaction of phone response SLAs). That sort of evaluation of past performance "is a matter within the discretion of the contracting agency … entitled to considerable deference." *Taahut*, 849 F. App'x at 266 (quotation marks omitted).

Similarly, GSA was within its discretion to credit past performance reviews that critiqued CWT's failure to meet phone response time SLAs. GSA was required to review past efforts in "providing travel management services" and "meeting or exceeding service levels as outlined in previous contracts." AR1859-60. CWT argues that crediting those critiques under the first quality element, which "was supposed to be general success in providing travel services," "effectively double-counted the second Quality element." ECF No. 33-1 at 19. But CWT does not dispute that

telephone responses to requests for travel services constitute one aspect of "providing travel services." It was not arbitrary or capricious for GSA to consider reviews discussing, among other things, CWT's past phone response times when determining whether CWT's past performance demonstrated "general success in providing travel services." That sort of determination falls within GSA's discretion. *See Taahut*, 849 F. App'x at 266.

**2. GSA rationally determined that Omega's past performance was relevant**

The solicitation states that, for past performance, "[p]rojects found to not be recent will not be evaluated." AR1692. The solicitation defines recent as "no older than 3-years from the date the solicitation is issued." AR1687. The solicitation was issued on August 19, 2024 (AR739), so the recency window began on August 19, 2021.

Omega submitted three examples. AR3862-63; AR2664-69. CWT argues that two of those examples fell outside the solicitation's three-year recency window, but GSA improperly considered them anyway. ECF No. 33-1 at 21-30. Those two contracts are currently active, but performance began before 2021. AR2664-67; *see also* AR3862 ("Performance is active (2005 – Present)"); *id.* ("Performance is ongoing (2007 – Present)"). GSA interpreted the recency window as encompassing projects that were active within the last three years, even if the projects began before 2021. Under GSA's interpretation, all three of Omega's references were "recent" because they were all active during the three-year window. *See* AR3862-63. CWT argues that, because parts of those contracts were performed before 2021, GSA should not have evaluated them. ECF No. 33-1 at 23-26.

Interpretation of a solicitation begins with the plain language of the solicitation. *Banknote*, 365 F.3d at 1353. The court must "consider the solicitation as a whole, interpreting it in a manner

that harmonizes and gives reasonable meaning to all of its provisions" and must give provisions "their plain and ordinary meaning." *Id.*

GSA's interpretation of the three-year window is reasonable. The solicitation does not clarify whether "no older than 3-years" means that performance cannot have started before that. *See* AR1687. It was reasonable for GSA to decide that projects that were still active within the three-year window were "no older than 3-years from the date the solicitation was issued." And it makes sense that a project that began a long time ago but is ongoing is relevant to determining how the contractor might perform now.

Even if CWT's narrower interpretation were equally reasonable, that only makes the solicitation patently ambiguous. A patent ambiguity is obvious on the face of the contract such that it would "place a reasonable contractor on notice and prompt the contractor to rectify the inconsistency by inquiring of the appropriate parties." *K-Con, Inc. v. Secretary of Army*, 908 F.3d 719, 722 (Fed. Cir. 2018). GSA did not clarify whether "no older than 3-years" means that performance cannot have started before the three-year window. It was apparent from the face of the solicitation that the window could be applied either way. For an offeror to complain about a patent ambiguity in a solicitation, it must complain before any award. *See Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007).

CWT also argues that Omega's three past projects were not sufficiently similar to the services required by the solicitation. *See* ECF No. 33-1 at 24-30. CWT critiques, among other things, the scope of those projects, the longer phone response time requirements, and the lack of after-hours service requirements. *Id.* But the agency's determination that those projects were relevant is subject to "considerable deference." *See Taahut*, 849 F. App'x at 266 (quotation marks omitted). Omega's three past projects involved travel services, including services provided via phone. *See,*

*e.g.*, AR3862 (contract providing "24/7/365 support for domestic and international travel reservation requests" for the U.S. Postal Service); *id.* (contract providing "official and leisure travel services and support for all [National Gallery of Art] travelers"); AR3863 (contract providing "full government and leisure travel services for US service members and their family" in South Korea). It was reasonable for GSA to determine that those past projects, which involved providing travel services, including phone support, for federal organizations, were relevant to the contract at issue here, which involves providing travel services, including phone support, for the U.S. Marine Corps (*see* AR1532).

CWT specifically argues that Omega's past projects should have been rated as less relevant because they required phone response times that were longer than the 30-second times required by the contract at issue here. ECF No. 33-1 at 28; ECF No. 37 at 15 (noting that the phone response time SLA for Omega's South Korea contract was 3 minutes). But GSA reasonably evaluated past performance to determine whether the offerors had met their contract metrics, whatever those metrics might have required. *See* AR3875 ("[M]aintaining SLAs in accordance with contractual requirements are the backbone of this task order's service."). Further, some of Omega's past projects did have 30-second phone response time requirements, and Omega met those requirements. *See* AR3324 (reporting on "% Calls Answered 30 secs" for U.S. Postal Service project); AR3719 (reporting on "Percent of calls answered within 30 seconds" for National Gallery of Art project). Reviews for CWT's past projects, by contrast, indicate that CWT failed to meet requirements for both 3-minute and 30-second response times. AR3874 (noting CWT's failure to address "deficiencies with corrective action to answer calls 70% of the time within either 3 minutes or 30 seconds depending on the task order").

GSA's determination that Omega's references were relevant was not irrational, arbitrary, or capricious.

**C. GSA rationally evaluated Omega's pricing**

CWT argues that GSA's price evaluation of Omega violated the solicitation and regulations regarding price transparency. ECF No. 33-1 at 30. CWT challenges GSA's determination that Omega's prices were "fair and reasonable." *Id.* at 31. A price reasonableness analysis "sits comfortably" within a contracting officer's broad discretion. *DynCorp*, 10 F.4th at 1311. Thus, as long as GSA's evaluation of Omega's price was reasonable, this court "may not substitute its judgment" for that of the agency. *Id.* (quotation marks omitted).

For a GSA schedule contract, like the one at issue here, each contractor is required to publish a Multiple Award Schedule price list of all supplies and services it offers. FAR 8.402(b). If the particular contract requires supplies or services not included on the contractor's price list, a contracting officer can add those items ("open market items") to the contract order. FAR 8.402(f). To determine whether a contractor is offering an open market item, a contracting officer must determine whether the service or product is actually encompassed under the price list. *See Mobile Medical International Corp. v. United States*, 95 Fed. Cl. 706, 726 (2010) (the relevant inquiry is "whether the services or positions offered are actually included on the vendor's [schedule price list], as reasonably interpreted"). If not, the contracting officer must determine that the offered price is fair and reasonable. FAR 8.402(f)(2).

CWT argues that Omega falsely stated that it was not proposing any open market items but failed to tie its pricing to any price-list items or provide documentation showing that its open-market-item prices were fair and reasonable. ECF No. 33-1 at 33. The government responds that Omega reasonably tied each price to a line item on Omega's price list, effectively making those unlisted items not open market. ECF No. 35 at 33. The government also argues that even if the

unlisted items were open market, Omega provided sufficient pricing narrative to support its quote by tying the price of each item to the price of a particular line item, CLIN0002, which was not an open market item.

GSA's determination that Omega's pricing was reasonable was not arbitrary, capricious, or contrary to the solicitation or regulations. Even if Omega's proposal did include open market items, Omega provided sufficient narrative for the contracting officer to determine whether the prices were fair and reasonable.

The solicitation requires that a contractor provide supporting documentation "to support a fair and reasonable price determination" for any open market items included in a quote. AR1689; AR1856. Omega identified four contract line item numbers as open market items and explicitly tied the prices for those items to CLIN0002, which was not an open market item. AR3313. Tying the price of the other contract line items to a non-open-market item sufficiently fixed the price of the other contract line items such that GSA could determine whether the price was fair and reasonable. Similarly, Omega provided narratives for some contract line items explaining that the price for each of those items was encompassed by the prices provided for other contract line items. *See, e.g.*, AR3320 (describing the cost for "International Rate Desk Services" as "No additional charge. Included in Transaction"). Between Omega's initial price proposal and its responses to exchanges with GSA concerning its pricing (AR3309-23), the contracting officer reasonably determined that she had what she needed to determine that Omega's prices were fair and reasonable. *See* AR3892. This court will not disturb that judgment.

**D. GSA rationally determined that Omega provided the best value**

CWT points to the challenges it has made to the award decision, discussed above, to ultimately argue that GSA's best-value decision was "arbitrary, capricious, and contrary to the [solicitation]." ECF No. 33-1 at 37. Just as CWT's challenges to the specifics of GSA's evaluation fail,

CWT's challenge to GSA's ultimate award decision fails. CWT has not demonstrated that any aspect of GSA's award decision was arbitrary, capricious, or contrary to the solicitation. Agencies have a "great deal of discretion in making contract award decisions," particularly when those decisions are based on a best-value analysis. *Banknote*, 365 F.3d at 1355. GSA provided a rational explanation for its determination that Omega would provide the best value to the agency, in part based on the agency's negative past experience with CWT in the predecessor contract. *See* AR3877 ("GSA and [Department of Defense] have firsthand knowledge of CWT's performance … . [O]ut of 120 opportunities to meet the after-hours SLAs, CWT met them for two months, or 1.7% of the time."); AR3896 ("CWT is the only GSA managed [defense travel management office travel management company] that has oversight because of not meeting SLAs."). That rational explanation was predicated on CWT's reasonable interpretation of the solicitation and assessment of both Omega's and CWT's proposals. Because GSA gave a rational explanation for its award decision, this court will not disturb it.

### E. CWT is not entitled to an injunction

To obtain a permanent injunction, a protester must demonstrate that it succeeded on the merits of the case. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004). Here, CWT has failed on the merits. Thus, no injunction is warranted. *See Obsidian Solutions Group, LLC v. United States*, 54 F.4th 1371, 1376 (Fed. Cir. 2022) ("There can be no injunctive relief without a corresponding prevailing claim.").

## III. Conclusion

For the reasons stated above, this court **denies** CWT's request for judgment on the administrative record (ECF Nos. 32 and 33) and **grants** the government's and Omega's cross-motions for judgment on the administrative record (ECF Nos. 34 and 35). The clerk of the court shall enter judgment accordingly.

**IT IS SO ORDERED.**

/s/ Molly R. Silfen
MOLLY R. SILFEN
Judge